UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division

3-05-CV-391     FILED
CHARLOTTE, N. C.

SEP 14 2005

U. S. DISTRICT COURT
W. DIST. OF N. C.

| | | |
|---|---|---|
| In re: | | |
| NICHOLAS DIBRUNO AND WENDY DIBRUNO, | Case Number 05-33005 | |
| Debtors. | Chapter 7 | |
| In re: | | |
| JOSEPH A. DIBRUNO, JR., | Case Number 05-33006 | |
| Debtor. | Chapter 7 | |
| In re: | | |
| JOSEPH A. DIBRUNO, SR., | Case Number 05-33007 | |
| Debtor. | Chapter 7 | |
| In re: | | |
| LELA L. DIBRUNO, | Case Number 05-33712 | |
| Debtor. | Chapter 7 (Involuntary) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDER GRANTING TRUSTEE'S EX PARTE MOTION FOR ORDER TO PERMIT ENTRY FOR PURPOSE OF INSPECTION

This matter came before Court on the Ex Parte Motion (the "Motion") of Langdon M. Cooper, the duly appointed chapter 7 trustee (the "Trustee") in the bankruptcy cases of Nicholas and Wendy DiBruno, Joseph A. DiBruno, Jr., and Joseph A. DiBruno, Sr. A hearing on the Motion was conducted on September 13, 2005 (the "Hearing"). By oral motion during the Hearing, the Trustee requested that the Court grant the relief requested in the Motion as to Lela L. DiBruno, a debtor in an involuntary chapter 7 bankruptcy case, case number 05-33712. The

debtors in the above-referenced bankruptcy cases are referred to collectively herein as the "Debtors." The Court having considered the Motion, the record, including affidavits, and the arguments of counsel, has determined that the Motion should be allowed and sets out its findings of fact and conclusions of law as follows:

1.  Nicholas DiBruno and Wendy DiBruno, Joseph A. DiBruno, Jr., and Joseph A. DiBruno, Sr. filed their petitions pursuant to chapter 7 of the United States Bankruptcy Code on July 26, 2005 (the "Petition Date"). The Trustee is the duly appointed chapter 7 trustee in each of the Debtors' cases.

2.  Creditors Locke Holland and Cynthia Dimmette filed an involuntary chapter 7 bankruptcy petition against Lela L. DiBruno, on September 9, 2005.

3.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4.  Nicholas DiBruno ("Nick DiBruno"), one of the Debtors, is a thirty-three year-old male. He currently resides with his wife, Wendy, also a debtor, and their child at 184 Reese Wilson Road in Belmont, Gaston County, North Carolina, 28012.

5.  Joseph A. DiBruno, Jr. ("DiBruno, Jr."), one of the Debtors, is a thirty-six year-old unmarried male. He currently resides at one or more locations: (a) with his father at 7319 Wilkinson Boulevard, Belmont, Gaston County, North Carolina 28012; (b) with his mother at 103 Poplar Street, Belmont, Gaston County, North Carolina 28012; or (c) 107 Westwood Drive, Belmont, Gaston County, North Carolina 28012, a house owned by his mother but otherwise unoccupied.

6.  Joseph A. DiBruno, Sr. ("DiBruno, Sr."), one of the Debtors, is a seventy-one year-old male and the father of DiBruno, Jr. and Nick DiBruno. DiBruno, Sr. currently resides at

7319 Wilkinson Boulevard, Belmont, Gaston County, North Carolina 28012.

7. Lela DiBruno is the former wife of DiBruno, Sr. and the mother of Nick DiBruno and DiBruno, Jr. Until recently, she maintained the family residence at 107 Westwood Drive, Belmont, Gaston County, North Carolina 28012, but currently resides with her sister, Mary "Punk" Smiley, at a rental property located at 103 Poplar Street in Belmont.

8. As indicated in exhibits to the Motion, the Debtors have been the subjects of civil court proceedings in the past. For example:

    a. In a 1989 civil proceeding brought by the Securities and Exchange Commission against National Gas & Power Company, Inc. and DiBruno, Sr. in the United States District Court for the Western District of North Carolina (case 89-CV-207), the Honorable James B. McMillan, in detailed Findings Of Fact And Conclusions Of Law, dated July 8, 1991 in support of a permanent injunction, accounting, and disgorgement, found that DiBruno, Sr., a controlling person of National Gas & Power Company, Inc. ("NGP"),

> misrepresented and failed to state material facts concerning (a) the sale of NGP stock at arbitrary and capricious prices; (b) the conversion (theft) of investors' funds by DiBruno; (c) the financial condition of NGP, in particular that NGP was insolvent; (d) the acquisition of contracts for the recycling of garbage for local government bodies which they falsely represented could produce millions of dollars in revenue for NGP; and (e) the prospective rise in the price of NGP stock of a hundred to a thousand percent within a matter of weeks and months respectively.

    b. In a 2004 civil proceeding in the United States District Court for the Southern District of Indiana brought by Kenneth David Aronoff against DiBruno, Jr., DiBruno, Sr., Nick DiBruno, Lela DiBruno, and others

(case 04-CV-1126), on December 20, 2004, the Honorable John Daniel Tinder made the following statement:

> I think it's clear from the showing made on the papers and in the testimony provided, the exhibits introduced today that the four DiBrunos through a series of odd familial and business arrangements operate a continuing series of shell games that are constantly evolving; and as one scheme plays out, funds are shifted into another and another, and so on, and that they work as an integrated team with different individuals playing the front person on different matters and Lela often controlling the banking records. And there is troubling evidence that would indicate a spoliation of records that would be vital in response to an earlier order issued by this Court, the intentional destruction of things and efforts being made to evade the requirements imposed by this court on Joseph A. DiBruno, Jr. . . . The inadequacy of the remedy at law is shown by the remarkably rapid rate at which assets are dissipated and the stunningly high end of the scale at which the DiBrunos live, . . . No judgment issued even a month from today would be collectable given the remarkable rate at dissipation of assets that the DiBrunos are achieving.

8. According to the following Debtors' schedules, they reside at the following addresses:

| Debtor | Address |
| --- | --- |
| Nicholas DiBruno & Wendy DiBruno | 184 Reese Wilson Road<br>Belmont, NC 28012 |
| Joseph A. DiBruno, Jr. | 107 Westwood Drive<br>Belmont, NC 28012 |
| Joseph W. DiBruno, Sr. | 7319 Wilkinson Blvd.<br>Belmont, NC 28012 |

According to testimony at the § 341 meetings, held on August 24, 2005, these Debtors reside at the following addresses:

| Debtor | Address |
|---|---|
| Nicholas DiBruno & Wendy DiBruno | 184 Reese Wilson Road<br>Belmont, NC 28012 |
| Joseph A. DiBruno, Jr. | 107 Westwood Drive<br>Belmont, NC 28012<br><br>and<br><br>103 Poplar Street<br>Belmont, NC 28012 |
| Joseph W. DiBruno, Sr. | 7319 Wilkinson Blvd.<br>Belmont, NC 28012 |

Lela DiBruno resides at 103 Poplar Street, Belmont, NC 28012.

9. The following Debtors' schedules list the following personal property:

| Debtor | Schedule B Personal Property |
|---|---|
| Nicholas DiBruno & Wendy DiBruno | Living Room Furniture $250<br>Bedroom Furniture $500<br>Stereo $100<br>Refrigerator $100<br>Washer $100<br>Dryer $100<br>VCR $50<br>Computer Equipment $500<br>Odds & Ends $500<br>T.V. $500<br>Clothing $300<br>Wedding Band (W) $1,000<br>Wedding Band (H) $300<br>Watch $200 |
| Joseph A. DiBruno, Jr. | Living Room Furniture $500<br>Den Furniture $600<br>Bedroom Furniture $500<br>Stereo $100<br>Refrigerator $100<br>Odds & Ends $100<br>T.V. $500 |

|  | 2 Painting $250 |
|  | 30 Books $250 |
|  | Clothing $300 |
|  | Sterling Silver Cross & Chain $25 |
|  | Assorted Fishing Gear $200 |
|  | Camera $150 |
|  | 1995 Utility Trailer $250 |
|  | Office Desk $50 |
|  | Computer Equipment $200 |
|  | Fax Machine $35 |
|  | Software $50 |
| Joseph W. DiBruno, Sr. | Living Room Furniture $250 |
|  | Bedroom Furniture $400 |
|  | Refrigerator $150 |
|  | Washer $100 |
|  | Dryer $100 |
|  | VCR $50 |
|  | Computer Equipment $400 |
|  | T.V. $350 |
|  | Old Books $100 |
|  | Old Pictures $300 |
|  | 2 Wood Carving $500 |
|  | Clothing $300 |
|  | Wrist Watch $100 |
|  | Old Pocket Watches $100 |
|  | 1976 MDL Ruger Pistol $100 |
|  | 200 Shares of Rennaisance 14 Corp. unknown |
|  | Food Supplement Ingredient $300 |

10. Affidavits attached to the Motion (collectively, the "Affidavits") show assets far greater than those disclosed in the schedules by the DiBrunos:

    a. The affidavit of Heather Costner (the "Costner Affidavit") identifies in a detailed list of assets located at the family residences at 107 Westwood and the Nick and Wendy DiBruno residence on Reese Wilson Road and her statements that she is personally familiar with the assets at these residences, that she has reviewed the bankruptcy schedules filed by these

6

debtors, and the schedules do not accurately reflect the assets they own and/or possess.

b. The affidavit of Larry J. Farmer (the "Farmer Affidavit") includes his statement that he is personally familiar with the DiBruno's property on Westwood Drive and Reese Wilson Road; that he has reviewed the bankruptcy schedules filed by Nick DiBruno and DiBruno, Jr. and those schedules do not include "nearly all the assets they possess and/or own," that the DiBrunos own "many expensive paintings and statutes, antiques, collectibles, books, diamonds, Rolex watches, guns, guitars, expensive furniture, and other jewelry not listed on the schedules," and that DiBruno, Jr. and DiBruno, Sr. keep a safe at the Westwood Drive residence and Nick DiBruno keeps a safe at the Reese Wilson Road residence.

c. The affidavit of Bill Branscom (the "Branscom Affidavit"), a private investigator, states that he has spent considerable time investigating the DiBrunos for two creditors, Locke Holland and Cynthia Dimmette; he has developed a number of sources, including at least one confidential source who has provided reliable information in the past; that confidential source reports that DiBruno, Jr. possesses a duffel bag containing approximately $500,000 in cash and over $600,000 in uncashed checks, which is currently concealed at the residence of Lela DiBruno; and that within the last several years, the DiBrunos have spent $82,143.50 at Sumpter's Jewelry and $11,369.01 at Hyatt's Gun Shop.

7

11. The Trustee represented to the Court that, based on the Affidavits, he had determined that it was likely that the four residences used by the DiBruno family contain material assets not disclosed in their bankruptcy schedules. For example, no guns and no substantial jewelry are listed in the Debtors' schedules.

12. The Trustee further concluded that the DiBrunos have a proclivity to hide, move or conceal their assets, based on:

    a. the findings by Judge Tinder in the Southern District of Indianapolis;

    b. what the Trustee believes to be misrepresentations regarding the DiBrunos assets;

    c. the statement in paragraphs 10 and 11 of the Farmer Affidavit that the DiBrunos "planned this bankruptcy filing in order to elude creditors" and "[t]he DiBrunos are constantly moving their assets in order to hide them from creditors. They often move their assets to storage facilities and warehouses in the Belmont area";

    d. the statements in the Branscom Affidavit that DiBruno is concealing cash and uncashed checks (para. 17), that the DiBrunos maintain safes at two of the residences to conceal assets (para.18); that Nick DiBruno has entrusted guns to Stephen Trent Horne of Belmont; that the DiBrunos have made numerous telephone calls to jewelers in the last thirty days; and

    e. additional information in the Affidavits.

13. Section 544(a)(2) of the Bankruptcy Code grants the Trustee the rights and powers of "a creditor that extends credit to the debtor at the time of the commencement of the

case, and obtains, at the time and with respect to such credit, an execution against the debtor that is returned unsatisfied at the time, whether or not such a creditor exists." 11 U.S.C. § 544(a)(2). Section 105 of the Bankruptcy Court allows the court to issue any order, process or judgment that is necessary or appropriate to carry out the Code's provisions. 11 U.S.C. § 105(a).

14. Article 31 of Chapter 1, Subchapter X, of the North Carolina General Statutes outlines supplemental proceedings ("Supplemental Proceedings") that may be employed by judgment creditors in the event that an execution is returned unsatisfied. N.C. Gen. Stat. § 1-352, *et seq.* By virtue of operation of § 544(a)(2) of the Bankruptcy Code, the Trustee is entitled to invoke the State law provisions relative to Supplemental Proceedings.

15. The Supplemental Proceedings include a provision that allows a judgment creditor, upon a motion showing good cause, to request that the court:

> Order the judgment debtor or anyone acting for or on his behalf to permit entry upon designated land or other property, real or personal, in his possession or control or subject to his control for the purpose of inspecting, measuring, surveying, appraising, copying, or photographing the property of the judgment debtor.

N.C. Gen. Stat. § 1-352.2(2).

16. Section § 1-352.2(3) of the Supplemental Proceedings requires judgment creditors seeking orders pursuant to this section to serve the judgment debtor with prior notice of such motions as provided by the State's Rules of Civil Procedure. N.C. Gen. Stat. § 1-252.2(3). Upon a hearing on such a motion, the court is to specify the time, place, and manner of compliance with the court's order as well as any terms or conditions of the order that are just. *Id.*

17. The Affidavits demonstrate that good cause exists to support the Court's Order pursuant to § 1-352.2(2). Although Supplemental Proceedings require notice and a hearing pursuant to § 1-352.2(3) and the State's Rules of Civil Procedure, because of the Debtors'

9

previous history of hiding, moving or concealing their assets, the Court has determined that its Order should be entered on the Trustee's *ex parte* motion without notice to the Debtors.

18. The Court has determined that these cases present the type of extraordinary or exigent circumstances that allow the Court to enter an *ex parte* order. As indicated above, other courts have found the Debtors to be less than forthcoming with regard to the extent, nature and location of their assets. And as detailed in the Affidavits, the Debtors may well be secreting assets that are the property of their bankruptcy estates.

19. The Federal Rules of Civil Procedure recognize that extraordinary circumstances may require a party to proceed without notice. In particular, Rule 65(b) of the Fed. R. Civ. P. provides a means of obtaining a temporary restraining order "without written or oral notice to the adverse party or the adverse party's attorney." This procedure requires a showing by affidavit or complaint "that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition" and a certification from the applicant's attorney that notice should not be required. Fed. R. Civ. P. 65(b); *see also Ciena Corp. v. Jarrard*, 203 F.3d 312, 319 (4th Cir. 2000) (discussing the availability of a TRO without notice).

20. The standards outlined in Rule 65(b) relative to relief without notice provide a framework for the Court to apply in this matter. Were this a Rule 65(b) motion, the Affidavits would support a showing that the Debtors' bankruptcy estates are likely to suffer immediate and irreparable loss should the Debtors receive notice of this motion. Further, as cited above, another court has specifically commented on the Debtors' patterns of behavior and "the remarkably rapid rate at which [their] assets are dissipated." Thus the first prong of Rule 65(b) is met here. As for the second prong, the Trustee and his counsel certified to the Court that the Debtors' past

10

behavior combined with the evidence provided in the Affidavits that the Debtors' voluntary petitions substantially misrepresented the extent of the property of the bankruptcy estates support the Court's ordering the relief requested on an *ex parte* basis.

21. In addition to the framework provided by analogy to Rule 65(b), this Court finds support for its *ex parte* action when conditions warrant in decisions by other courts. Under extraordinary circumstances such as these, other courts have found authority to enter *ex parte* orders to aid in the preservation of estate assets. For example, in *Quiros-Lopez v. Unanue-Casel (In re Unanue-Casal)*, 144 B.R. 604 (D.P.R. 1992), the court held that an *ex parte* order attaching the assets of a corporation controlled by the debtor entered without notice was proper because of the extraordinary circumstances at play. 144 B.R. at 613. The debtor in that case had claimed to have no assets and had fraudulently transferred assets to his wife and two corporations he controlled. *Id.* At the same time, the debtor and his wife had refused to answer questions regarding their ownership interests and had transferred the proceeds of the sale of one property to a Swiss bank account. *Id.* at 607, 613. The court stated that its *ex parte* attachment order was justified so as to ensure that assets would be available should the trustee in that case prevail in the adversary proceeding. *Id.*

22. In another case, a creditor's committee was granted relief on its *ex parte* motion for authority to institute proceedings in Guernsey upon evidence that the debtor's sole shareholder had transferred the debtor's funds there and deliberately destroyed financial documents relative to the transfer. *In re International Administrative Services, Inc.*, 211 B.R. 88, 91 (Bankr. M.D. Fla. 1997). Although no notice was given to the shareholder, the court found that the *ex parte* order allowing the committee to proceed in Guernsey with their request to freeze the transferred funds did not violate due process but merely preserved the status quo. *Id.*

11

at 97. In so holding, the court drew a distinction between freezing assets and seizing them. *Id.* For the sake of argument, however, the court discussed seizures in general, explaining that while notice and a hearing generally are required before property may be seized, exceptions are allowed when the moving party can show exigent and extraordinary circumstances. *Id.* The court announced its determination that such circumstances warranted a hearing on the committee's motion without notice to the shareholder using as examples his "pattern of lack of cooperation" and deliberate destruction of necessary financial documents. *Id.* In the court's view, the committee's concerns that more documents would be destroyed and the funds in Guernsey would be transferred were legitimate. *Id.*

23. The Bankruptcy Court for the Eastern District of Michigan, when faced with a debtor who had engaged in numerous allegedly fraudulent transfers, permitted the chapter 7 trustee to conduct an inspection of a debtor's home without notice to the debtor. *In re Barman*, 252 B.R. 403 (Bankr. E.D.MI. 2000). The court's *ex parte* order was based on the trustee's concern that advance warning the debtor would result in a less than full and candid inventory of the debtor's personal property. *Id.* The *Barman* trustee supported his motion for *ex parte* relief by outlining the debtor's pattern of shifting assets to family members, including his wife. *Id.* at 408-410. The schedules filed in that case listed $500 in wearing apparel as the debtor's only asset. *Id.* at 407.

24. The *Barman* court held that the status and function of a chapter 7 trustee suggested "a sufficient nexus to the government and its power" to make the fourth amendment and its limits applicable. *Id.* at 412-13. The court went on to discuss the reasonableness of the warrantless search of the debtor's home concluding along the way that bankruptcy debtors have a diminished expectation of privacy by virtue of their bankruptcy filing. *Id.* at 415. According to

12

the *Barman* court, trustees may have no way to carry out their statutory obligations to account for estate property without inspecting debtors' residences. *Id.* at 417. The court outlined the constitutionally required procedures for inspecting a debtor's home and applied them to the search that was conducted. *Id.* at 418-19. Ultimately, the *Barman* court concluded that the trustee had "acted entirely reasonably in obtaining and executing the inspection order" and that the debtor received all the protections embodied in the fourth amendment. *Id.* at 420.

25. The facts in *Barman* indicated an extended series of highly suspect transactions as well as hiding assets the court cited as ample reasons for entry of its *ex parte* order. *Id.* at 419. Yet in a pre-*Barman* decision on similar facts, a district court denied a trustee's request for a search warrant based on allegations that the debtors were concealing assets. *In re Application of Trustee in Bankruptcy for a Search Warrant*, 173 B.R. 341 (N.D. Ohio 1994). The court in that case stated that, to the extent the trustee had alleged that the debtors were secreting their assets unlawfully, those allegations indicated violations of federal criminal law. 173 B.R. at 342. Investigation would, therefore, be the responsibility of the United States Attorney's Office and federal law enforcement officials. *Id.*

26. Post-*Barman* decisions by other courts have been critical of its holding. *See, e.g., In re Truck-A-Way*, 300 B.R. 31 (E.D. Calif. 2003). The *Truck-A-Way* court did not rule on whether the type of orders entered in *Barman* were permissible; however, that court did state that it strongly disagreed with the *Barman* court's interpretation of a bankruptcy court's authority under the fourth amendment. 300 B.R. at 38, n.13.

27. *Barman's* application of the fourth amendment to allow searches of bankruptcy debtors' homes has received further criticism from two law review commentators. One author expressing concern over *Barman's* implications for privacy rights commented that individuals

13

are vested with fundamental constitutional rights that are not discharged along with debt when a bankruptcy petition is filed. Jennifer Taylor, *Some Bargain: How Bankruptcy Courts May Now Require a Debtor to Relinquish Expectations of Privacy as a Condition of the Bankruptcy Bargain*, 56 HASTINGS L.J. 609, 628 (2005). Another commentator stated that "[n]othing in the Bankruptcy Code or Rules (or any other federal statute or regulation) . . . places debtors on notice of the possibility that a private attorney or accountant appointed as a Chapter 7 trustee would have the authority to enter and search their homes in a non-criminal bankruptcy proceeding." A. Mechele Dickerson, *Can the Public Interest Justify Non-Consensual Searches of Homes in Bankruptcy Cases?*, 11 Wm. & Mary Bill Rts. J. 267, 292 (2002). Although Dickerson acknowledges that Mr. Barman "was not a saint," and had likely done everything he was accused of, she concludes that even debtors who hide assets retain basic constitutional protections. *Id.* at 304. Thus, according to Dickerson, searches in bankruptcy cases should be viewed as presumably unreasonable because they are not required nor provided for under the Bankruptcy Code. *Id.*

28. The court in *In re Kerlo*, 311 B.R. 256 (Bankr. C.D.Calif. 2004), distinguished both *Truck-A-Way*, which was critical of *Barman*, and *Barman* itself by stating that neither decision applied Ninth Circuit precedent relative to application of the fourth amendment. *Kerlo*, 311 B.R. 264. The Kerlo court quoted the Ninth Circuit's rule as follows:

> The fourth amendment will only apply to conduct that can reasonably be characterized as a "search" or "seizure." Thus, for the conduct of a non-law enforcement governmental party . . . to be subject to the Fourth Amendment, [plaintiff] must show that [defendant] acted "with the intent to assist the government in its investigatory or administrative purposes and not for an independent purpose."

*Id.* (citing *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 924 (9th Cir. 2001)). The Fourth Circuit employs the same rule relative to the fourth amendment. In *U.S. v. Jarrett*, the

14

Fourth Circuit stated that the fourth amendment's protections are triggered based on: "(1) whether the Government knew of and acquiesced in the private search; and (2) whether the private individual intended to assist law enforcement or had some other independent motivation." *Jarrett*, 338 F.3d 339, 344 (4th Cir. 2003). In *Jarrett*, a computer hacker had provided information to the FBI regarding a child pornographer that resulted in a search warrant and the arrest of the pornographer. *Id.* at 342. The Fourth Circuit held that, despite the fact that FBI agents had encouraged the hacker to send them information, the requisite agency relationship did not exist between the hacker and the government to make the fourth amendment applicable. *Id.* at 346-47. The *Jarrett* court explained the three major lessons relative to application of the fourth amendment that have emerged from the case law:

> First, courts should look to the facts and circumstances of each case in determining when a private search is in fact a Government search. Second, before a court will deem a private search a Government search, a defendant must demonstrate that the Government knew of and acquiesced in the private search and that the private individual intended to assist law enforcement authorities. Finally, simple acquiescence by the Government does not suffice to transform a private search into a Government search. Rather, there must be some evidence of Government participation in or affirmative encouragement of the private search before a court will hold it unconstitutional.

*Id.* at 345-46.

29. As explained in *Kerlo*, bankruptcy trustees are not law enforcement officials. 311 B.R. at 265. Trustees may, in the process of carrying out their statutory and fiduciary duties, seek the help of government officials, but they do not act to assist the government in its investigatory or administrative activities. *Id.* Moreover, a trustee's motivation is to maximize the value of the bankruptcy assets of the estate and, therefore, not to assist the government in its law enforcement efforts. *Id.* Employing the federal marshals service did not, in the *Kerlo* court's view, transform the trustee's actions to a government search or seizure because the

15

purpose for using the marshals was to assist the trustee in removing the debtor and the debtor's personal property from a residence that was property of the estate while protecting the trustee's safety. *Id.* The *Kerlo* court concluded that, because the debtor's property had become property of the estate upon filing and the debtor had been ordered to vacate the property, the debtor no longer had a possessory interest in that property and could not properly exclude the trustee. *Id.* at 266

30. The reasoning outlined in *Kerlo* is applicable in this case because *Kerlo* applied the Ninth Circuit rule that has been adopted by the Fourth Circuit. Here, the Trustee seeks authorization to inspect the Debtors' property pursuant to the State's Supplemental Proceedings. The Trustee did not seek an order permitting him to seize the Debtors' property, but rather requested an opportunity to determine the true extent of the assets that comprise the bankruptcy estates in these cases. The Trustee is not acting on behalf of the government in this investigation and is motivated only by his duty to fulfill his statutory and fiduciary obligations to the Debtors' creditors. Thus, the fourth amendment does not apply to the Trustee's request.

31. In summary, pursuant to § 544 of the Bankruptcy Code, the Trustee was authorized to invoke North Carolina's process for Supplemental Proceedings which allow the Trustee to inspect the Debtors' property. The Trustee's motion was brought *ex parte* out of concern that notice to the Debtors would result in dissipation or concealment of any assets the Debtors did not list on their bankruptcy schedules. The Affidavits supporting the Motion outline that the circumstances presented are extraordinary and require that the Trustee proceed without notice. The Court, in following Fourth Circuit precedent, has determined that the fourth amendment does not apply to this situation because the Trustee seeks only to inventory estate

assets consonant with his statutory duties. An Order allowing the Trustee to conduct an inspection of the Debtors' residences will be entered contemporaneously herewith.

Graham C. Mullen
Chief United States District Judge